OPINION
{¶ 1} Jennifer P. Strother ("Jennifer") appeals from a judgment of the Montgomery County Probate Court, which denied her petition for adoption with the consent of the father. After a hearing on April 7, 2004, the trial court ruled that Jennifer had not met her burden under R.C. 3107.07(A) of establishing that the consent of the children's mother, Gayle Strother ("Gayle"), was not required. In her sole assignment of error, Jennifer claims that "the trial court erred in holding that Gayle Strother's consent to adoption is required."
 {¶ 2} The hearing testimony revealed the following facts:
 {¶ 3} Gayle and Brian Strother ("Brian") were married on June 7, 1992, in Houston, Texas, and had three children during their marriage. At the time of the April 2004 hearing, the children were ages ten, seven, and five. In 1995, Gayle and Brian moved to Alabama due to Brian's active duty in the United States Air Force. The couple separated in October 2000. Brian was reassigned to Wright Patterson Air Force Base, and he relocated to Ohio. Gayle remained in Alabama. By agreement of the parents, the children moved to Ohio with Brian. A temporary order required Gayle to pay $400 per month in child support during the separation. Gayle could not "remember if I paid any of it or not."
 {¶ 4} In March 2001, Gayle traveled to Ohio for her daughter's birthday, and she went to Brian's home for the party. The visit was mostly cordial. However, the couple argued after Brian would not let the children stay the night with Gayle at her hotel. The next morning when Gayle went to Brian's home, Brian did not answer the door and called the police. Gayle made a few more trips to Ohio in the Spring of 2001. During Spring break, Gayle spent four or five days in Ohio with the children.
 {¶ 5} On June 14, 2001, Gayle and Brian were divorced in Montgomery, Alabama. Due to Gayle's late arrival at the courthouse, Gayle was not permitted to participate in the final hearing on the divorce complaint. In the divorce decree, Brian was awarded sole custody of the children. Gayle was ordered to pay $852.00 per month in child support, even though she was only employed at Cracker Barrel. In July 2001, Gayle sought to alter, amend, or vacate the decree, apparently to no avail. To meet her support obligation, Gayle worked as a waitress at a Cracker Barrel restaurant and got a second job as a telephone operator at Maxwell Air Force Base.
 {¶ 6} Following the divorce, Gayle traveled to Ohio for her son's birthday. Gayle testified that Brian made a few visits to Alabama with the children. Brian testified that he traveled to Alabama around five to seven times to allow Gayle to visit with the children.
 {¶ 7} Around Thanksgiving 2001, Brian traveled for work for two weeks. Gayle "asked him if he could maybe let me come stay in his house and take care of the kids. Or they could come stay with me and I could take time off from one of my jobs for that time and he said `no.'" Instead, Brian made arrangements for the children to stay with others.
 {¶ 8} In February 2002, Brian was deployed overseas for six months. Brian informed Gayle of his assignment approximately two or three weeks before he was to depart. Gayle asked Brian to allow the children to come and stay with her. Brian indicated to her that his mother, who resided in Houston, would be caring for the children. Gayle sought legal advice to get legal custody of the children during Brian's assignment, but Brian left before he could be served with the necessary papers.
 {¶ 9} While the children were in Houston, Gayle routinely called the children on Sunday and Tuesday at their paternal grandmother's home. In March 2002, Brian's mother changed her telephone number; thereafter, Gayle was unable to contact the children at her home. Although she had not been able to reach Brian's mother, Gayle brought birthday gifts and Easter baskets to Houston, but she was unable to reach Brian's mother to deliver the gifts. Eventually, Gayle's mother, who also lived in Houston, took the baskets to Brian's mother's workplace. Gayle contacted Brian's mother at her place of employment and requested that she have the children call her. The children eventually called her around Mother's Day and sent her a Mother's Day card. In July 2002, Brian's mother contacted Gayle's parents and arranged for the children to see them during the last weekend of July. Gayle traveled to Houston to see the children that weekend. Brian returned the children to Ohio shortly thereafter.
 {¶ 10} From July 2001 to July 2002, Gayle complied with her support order, paying a total of $10,489.35. Her last payment was made on July 15, 2002. At that time, Gayle was fired from her employment. She testified that she was fired by the Base due to lateness and from Cracker Barrel for not going to work. She explained that the two jobs interfered with each other and she was using illegal drugs, specifically crystal methamphetamine. Gayle had "started doing drugs a lot" in March 2002, and after August 2002, Gayle lost her home. She lived at hotels and friends' homes, and she supported herself by selling drugs. In November 2002, Gayle became pregnant. Gayle remained unemployed until the end of October 2003.
 {¶ 11} Jennifer met Brian while they were overseas in Qatar with the Air Force. Jennifer and Brian were married on October 17, 2002, in Montgomery County, Ohio.
 {¶ 12} In January 2003, Gayle was arrested on drug-related charges. She called Brian from the jail, asking for assistance with the repossession of her car, which was apparently still titled in his name. Upon learning of Brian's remarriage to Jennifer, Gayle became upset and asked questions regarding Brian's new wife. Brian refused to answer questions about Jennifer. Gayle then asked to speak with the children. Brian responded that "this is not a good time."
 {¶ 13} In March 2003, Gayle contacted Brian, indicating that she wanted to travel to Ohio for her daugher's birthday. Brian indicated that they already had plans. Gayle made no further attempts to contact the children by telephone. However, she explained that she did not attempt further telephone contact "because of the way he tells me no. I can't even describe how he tells me every time, I talk to him about talking to the kids. Its — ." Gayle also did not send any cards or gifts to the children. She stated: "Well, I was afraid to. What is a card when they can't see me. What does a card mean, when they can't talk to me. It's a piece of paper. When I want to talk to my kids, I want to talk to my kids. I haven't seen them for a year and a half. I don't want them to get a piece of paper from me the first time they hear from me in a year and a half. I want to be able to look at them and tell them I love them."
 {¶ 14} In June 2003, Brian telephoned Gayle's father, John Yarusso, and told him that the children were better off without having contact with their maternal grandparents. According to Mr. Yarusso, Brian allegedly stated that "they have new grandparents and they don't really care about you. And * * * about Gayle either." Mr. Yarusso stated that Brian didn't want Gayle to have contact with the children. Mr. Yarusso acknowledged that Brian implied that the Yarussos should either be active in the children's lives or out of their lives. Mr. Yarusso further testified that he had attempted to talk to the children on a few occasions but had not been able to speak with them.
 {¶ 15} Gayle testified that she stopped using illegal drugs in June 2003. She was hospitalized for the final month of her pregnancy due to high risk factors. She did not have health insurance. On July 30, 2003, Gayle gave birth to another child. She is now in drug rehabilitation, a waitress at the Waffle House, and taking Zoloft for depression.
 {¶ 16} In September 2003, Gayle was re-arrested on federal drug charges, stemming from her January 2003 arrest. She pled guilty to conspiracy to distribute crystal meth, 50 to 150 grams. She has assisted the government by testifying against other people; however, she will still be incarcerated.
 {¶ 17} On October 23, 2003, L. Scott Johnson, an attorney who represented Gayle during the divorce, sent correspondence to Brian's divorce attorney in Alabama, indicating that he had been contacted by Gayle's parents. Gayle's parents had complained that Brian was not allowing the children to have telephone visitation with Gayle or their maternal grandparents. Brian received this letter on October 30, 2003.
 {¶ 18} Earlier that day, Jennifer filed a petition for adoption of the three children. She alleged that Gayle had failed to support or to visit with the children during the period between October 30, 2002, and October 30, 2003.
 {¶ 19} Based on the evidence, the trial court concluded that Jennifer had failed to prove by clear and convincing evidence that Gayle had failed, without justifiable cause, to communicate with her children or to support them as required by judicial decree. The court found that "there [was] significant and consistent interference by Brian with visitation to find that Gayle's failure to communicate with her children was justifiable." As for the failure to support, the trial court relied upon the fact that Gayle had obtained a medical malpractice settlement of approximately $70,000, during their marriage. After paying bills and purchasing household items, the balance was approximately $20,000. When Brian moved to Dayton, he took all but $1,000. Gayle indicated that he withdrew the money from their joint account and put it in an account under his name alone. Brian testified that he used the money for his divorce attorney's fees and for the support of the children. Brian indicated that the money was completely spent by the time of the divorce. The court also noted that Gayle paid the $400 per month support payments that were required during the couple's separation. In light of this evidence, the court found that, "since the child support payments equal about $10,000 @ year, then Gayle has maintained and supported her children far beyond what was ordered. It was her money, not Brian's[,] that he allegedly used to support the children. Therefore, she should get credit for that amount. The Court finds that Gayle did not support the children, but her failure was justifiable."
 {¶ 20} On appeal, Jennifer claims that the trial court erred in concluding that Gayle's failure to communicate with the children and her failure to provide maintenance and support were justified.
 {¶ 21} "The right of a natural parent to the care and custody of her children is one of the most fundamental in law. This fundamental liberty interest of natural parents in the care, custody and management of their children is not easily extinguished. Santosky v. Kramer (1982), 455 U.S. 745, 753-754. Adoption terminates those fundamental rights. R.C. 3107.15(A)(1). Accordingly, adoptions are generally not permissible absent the written consent of both parents. R.C. 3107.06." In re Adoptionof Stephens, Montgomery App. No. 18956, 2001-Ohio-7027.
 {¶ 22} Under R.C. 3107.07(A), a parent's consent to adoption is not required when that parent "has failed without justifiable cause to communicate with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner." The burden is on the petitioner to establish the natural parent's unjustifiable failure by clear and convincing evidence. In reAdoption of Masa (1986), 23 Ohio St.3d 163, 492 N.E.2d 140, at paragraph one of the syllabus. In determining whether the petitioner has met that burden, the probate court must focus on the year as whole, and not on whether the parent's failure was justified during any part of the year. In re Adoption of Bovett
(1987), 33 Ohio St.3d 102, 515 N.E.2d 919 (affirming the trial court's decision that the failure to pay was unjustified, despite three months of unemployment, upon focusing on the year as whole). "The question of whether justifiable cause for failure to pay child support has been proven by clear and convincing evidence in a particular case is a determination for the probate court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence." Id. at paragraph two of the syllabus; see also In re Adoption ofA.P.L., Montgomery App. No. 19772, 2003-Ohio-4433.
 {¶ 23} "In determining whether a judgment is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact `clearly lost its way and created such a manifest miscarriage of justice' that there must be a reversal of the judgment and an order for a new trial." Stegall v. Crossman, Montgomery App. No. 20306, 2004-Ohio-4691, ¶ 29, citing Pryor v. Tooson Clark App. No. 2002-CA-91, 2003-Ohio-2402, ¶ 29 (citations omitted). Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility. State v. Lawson
(Aug. 22, 1997), Montgomery App. No. 16288.
 {¶ 24} In the present case, Jennifer argues that Gayle had no contact with the children during the relevant time period, and she had attempted to contact the children only twice during that time. The first time, Brian did not let her speak with the children in January 2003, because she had primarily called for Brian's assistance and had asked to speak with the children only after "screaming on the phone" about Brian's new wife. The second time, Gayle was told that they had plans for her daughter's birthday. Jennifer asserts that his denial of these two requests did not constitute "significant interference."
 {¶ 25} "Significant interference by the custodian is required before the interference will be found to establish justifiable cause for a parent's failure to communicate." In Adoption ofJohnson (June 21, 1993), Clinton App. No. CA92-11-023. In determining whether significant interference has occurred, a court may consider the contacts between the parents prior to the one-year statutory time period. See id. In Johnson, the court rejected the argument that the failure to communicate was unjustified because the mother's interference occurred more than two years prior to the filing of the petition for adoption, the mother did not engage in any interference in the one year period prior to the filing of the petition, and the father had failed to attempt communication with the child during the relevant time period. The court reasoned that the mother's earlier acts of interference were "relevant to [the father's] state of mind during the one year period. The trial court viewed the interference as on-going and concluded that [the mother's] conduct contributed to [the father's] state of mind that it would be futile to attempt to contact the child."
 {¶ 26} In the present case, the trial court found that, although Brian initially had no problem with permitting Gayle to see the children, Gayle encountered opposition from Brian after their divorce became final. Although this certainly is not the only reasonable interpretation of the evidence, it is not against the manifest weight of the evidence. When Brian went out of town due to his Air Force duties, he did not permit Gayle to care for the children and he offered her no explanation for his refusal. Although Brian's mother initially permitted telephone contact between Gayle and the children, she changed her telephone number and permitted the children to contact Gayle once — on Mother's Day — during the additional four months that she was caring for the children in Houston. In addition, Brian's mother restricted contact between the children and Gayle's parents, who lived in the same city. Although Brian arguably had a reasonable basis for not permitting Gayle to talk to the children on the two occasions that she called in 2003, the trial court implicitly credited Gayle's testimony that she did not attempt further telephone contact "because of the way he tells me no." Given the trial court's interpretation of the evidence, the trial court could have reasonably concluded that Gayle believed her efforts would have been futile. Accordingly, we cannot conclude that the trial court's determination that Gayle's failure to communicate was justified is against the manifest weight of the evidence.
 {¶ 27} Second, Jennifer claims that the trial court erred, because Gayle completely failed to provide any support for her children during the relevant time period. Jennifer argues that this failure was obviously due to her drug abuse and concomitant voluntary unemployment. She further asserts that the trial court's reliance upon Brian's use of the medical malpractice settlement was improper.
 {¶ 28} We agree with Jennifer that the trial court should not have credited Gayle with the $19,000 from the medical malpractice settlement that Brian had taken. Brian and Gayle both testified that Brian took all but $1,000 of the remainder of the medical malpractice settlement when he moved to Ohio. Those funds were then placed in an account in Brian's name only. Paragraph 11 of the couple's final decree of divorce, which Gayle submitted as Exhibit C, provided that "each party is hereby awarded such financial accounts as shall now be in his or her individual name, including retirement accounts, as their sole property, free and clear of any claim of the other." Accordingly, at the time of the divorce, Brian was entitled to whatever funds remained in his account, free and clear of Gayle's claims. Although the evidence at the hearing suggests that Brian was not entitled to take that money, this was a matter that should have been raised in the Alabama courts as part of the divorce proceeding. In light of Gayle's lack of participation in the final divorce hearing, we are sympathetic to Gayle's circumstances. However, because the distribution of property was addressed in the divorce decree, any dispute regarding Brian's taking of the remainder of the malpractice settlement should have been addressed by the divorce court or in an appeal of the final decree. The trial court herein should not have credited the $19,000 against Gayle's support obligation.
 {¶ 29} While considering whether Gayle was justified in failing to provide support, the trial court took note of Gayle's circumstances during the relevant one-year period. The court stated:
 {¶ 30} "In July 200[2], Gayle was fired from both jobs and evicted from her home. She lived as a vagabond and was unemployed for the next 15 months. She became a chronic drug abuser and a seller to meet her daily habit. During this period she had no health insurance. She became pregnant and was hospitalized. The baby was born and he needed hospital care. She was unable to maintain stable employment or living arrangements or care for herself."
 {¶ 31} Although the trial court chose to emphasize the $19,000, it is apparent that these additional facts independently supported a conclusion that Gayle was justified in her failure to support. Although Jennifer has argued that Gayle was voluntarily unemployed and that her drug addiction was not a justifiable basis for her failure to support her children, we note that Gayle testified that she had stopped using drugs in June 2003 and that she and her new child subsequently had serious health problems that required hospitalization. Accordingly, this case does not present a situation where Gayle's drug abuse was the sole reason for her failure to pay the court-ordered support during the relevant time period. Compare In re Adoption of Zachary StevenS., Lucas App. No. L-03-1056, 2003-Ohio-3981 (affirming trial court's conclusion mother's failure to support was justified when mother was incarcerated for six months of the statutory period and was using drugs while not incarcerated) with In re Adoptionof Lassiter (1995), 101 Ohio App.3d 367, 655 N.E.2d 781 (holding that drug addiction alone is not a justifiable basis for the failure to support one's child). In Masa, the supreme court held that the ability to pay is a key factor in determining whether there is justifiable cause for failure to support a child. 23 Ohio St.3d at 167.
 {¶ 32} It is the province of the trial court to make the factual determination whether Jennifer has met her burden of showing, by clear and convincing evidence, that Gayle's failure to provide support between October 2002 and October 2003 was unjustified. Bovett, supra. However, because the trial court focused primarily on the $19,000, it failed to make a determination of whether Gayle's failure to support was justified, independent of the $19,000. In our judgment, the trial court should make this determination.
 {¶ 33} The assignment of error is sustained in part and overruled in part.
 {¶ 34} The judgment of the trial court will be vacated, and the case will be remanded for the entry of a new judgment, in light of our opinion herein, as to whether Jennifer has met her burden under R.C. 3107.07(A) on the support issue. The trial court may re-enter its judgment in favor of Gayle if it concludes that Gayle was justified, due to her circumstances, in her failure to provide support between October 2002 and October 2003.
Fain, P.J. and Brogan, J., concur.